UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JASON LORENTZEN,

                Petitioner,                               Hon. Paul L. Maloney

v.                                                   Case No. 5:06-CV-89

KENNETH McKEE,

                Respondent.

_____/


## REPORT AND RECOMMENDATION

        This matter is before the Court on Lorentzen's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Lorentzen's petition be **denied**.


## BACKGROUND

        As a result of events which occurred between November 1997 through March 1998, Petitioner was charged with nine counts of third degree criminal sexual conduct, four counts of fourth degree criminal sexual conduct, one count of furnishing alcohol to a minor, and five counts of knowingly disseminating sexually explicit material to a minor.  (Dkt. #15, Trial Transcript, February 22, 2001, 11-16).  Several individuals testified at Petitioner's trial.  The relevant portions of their testimony are summarized below.

1

**Joel Miller**

Joel Miller ("Joel") met Petitioner in December 1997.  (Dkt. #18, Trial Transcript, February 23, 2001, 56-57).  Joel was 19 years of age at the time.  (Tr. 57).  Joel first met Petitioner when he traveled to Petitioner's residence with two of his friends, T.H., who was fifteen years of age, and Gary Miller ("Gary").  (Tr. 58-59, 63-64).   The trio went to Petitioner's residence to ask Petitioner to purchase beer for them.  (Tr. 59).  Joel was reluctant to ask Petitioner to purchase alcohol for them because he had been told that Petitioner was a police officer.  (Tr. 59-61).  T.H. told Joel that Petitioner was "very cool" and "would do this for us."  (Tr. 61).  Reassured, Joel asked Petitioner if he would purchase beer for them.  (Tr. 59-61).  Petitioner agreed and purchased a 12-pack of beer for Joel and his friends.  (Tr. 59-61).  Joel and Petitioner quickly developed a friendship.  (Tr. 62).

Joel began attending parties at Petitioner's house on a regular basis with Gary, T.H., and T.H.'s 14 year old sister, E.H.  (Tr. 62-65).  These parties occurred every Friday and Saturday night through the end of February 1998.  (Tr. 64-65).  At these parties, T.H. and E.H. consumed alcohol provided to them by Petitioner.  (Tr. 65-68).  Several other underage girls also attended these parties, including K.H. and S.B.  (Tr. 69-70).  Joel was unsure exactly how old K.H. was, but believed that S.B. was 15 years of age.  (Tr. 69-70).  Joel testified that many of the attendees at these parties, including many of the girls, participated in games of strip poker.  (Tr. 66-72).

At one particular party at Petitioner's residence in January 1998, Petitioner and others "coaxed" a girl named L.K. to remove her shirt and expose her breasts.  (Tr. 73-74).  After this occurred, Petitioner began playing pornographic movies on his television.  (Tr. 74-76). Joel watched these movies, along with T.K., E.H., L.K., and Petitioner's girlfriend (and later wife), Melanie

2

("Melanie").  (Tr. 76, 114).  Petitioner also played a strobe light and used a fog machine at these parties.  (Tr. 76-77).  Joel testified that many people, boys and girls, danced naked at these parties.  (Tr. 77-82).  Joel observed Petitioner dancing naked during these parties "maybe two or three times."  (Tr. 81).  Joel, S.B, T.H., and E.H. often stayed overnight at Petitioner's residence following these parties.  (Tr. 82-83).

Petitioner told Joel that he liked that these underage girls were "getting naked at his house."  (Tr. 85-86).  Petitioner told Joel that "in order for everybody else to start taking their clothes off, [E.H.] would have to go first."  (Tr. 86-87).  Joel indicated that "once [E.H.] had alcohol in her," she would freely take her clothes off.  (Tr. 86).  Petitioner told Joel that he was "the greatest in bed" and that he wanted to have sex with E.H.  (Tr. 87, 93-94).  Petitioner told Joel that "stuff like this doesn't happen all the time" and that "it stays in the house, whatever happens stays there."  (Tr. 86).  Petitioner instructed Joel "don't go talk about it to everybody else."  (Tr. 86).

Joel testified concerning an incident involving K.H. that occurred at one of the parties at Petitioner's residence.  At this particular party, "people started getting naked" and E.H. and T.H. began "coaxing" K.H. to take off her clothes.  (Tr. 88-89).  At this point, Petitioner told Joel that "we got to get [K.H.] to get her clothes off."  (Tr. 89).  Joel refused to participate in this endeavor because K.H. "was like 12 years old."  (Tr. 89).  Joel also testified that on another occasion he, Petitioner, and two other men watched as several men engaged in sex acts with T.H., including vaginal penetration with Petitioner's "fake rubber penis."  (Tr. 90-94).  Joel later observed Petitioner "inserting the dildo into" T.H.  (Tr. 100).

During one of the parties at Petitioner's residence, Melanie commented that "her pubic region was shaved cleanly."  (Tr. 94-95).  T.H. responded that "she wanted it done."  (Tr. 95).

3

At this point, Petitioner began talking with T.H.  (Tr. 95).  Petitioner and T.H. then entered a bathroom and T.H. "was shaved when she came out" of the bathroom.  (Tr. 95).  Petitioner performed the same routine with E.H. and S.B.  (Tr. 95-96).  Petitioner then began bragging about his sexual ability and indicated a desire to show E.H. and S.B. where their "G spot" was located.  (Tr. 97-99).  E.H. and S.B. then entered a bathroom with Petitioner.  (Tr. 99).

Joel also described an incident in which Petitioner, Melanie, and T.H. were bathing together.  (Tr. 101-02).  After bathing together, the trio retreated to the bedroom that Petitioner and Melanie shared.  (Tr. 102-03).  The trio exited the bedroom 30-40 minutes later.  (Tr. 103).

**J.B.**

J.B. testified that she was S.B.'s younger sister.  (Dkt. #19, Trial Transcript, February 27, 2001, 202-03).  J.B. testified that she was presently 15 years of age.  (Tr. 202).  On one occasion when she was "around 12" years old, J.B. went to Petitioner's house with her sister.  (Tr. 204-05).  After arriving at Petitioner's house, J.B., Petitioner, and S.B. "went into the living room."  (Tr. 206).  Petitioner then played a pornographic videotape.  (Tr. 206-12).

**S.B.**

S.B. testified that she first traveled to Petitioner's house "in the fall of 1997."  (Dkt. #19, Trial Transcript, February 27, 2001, 220-22).  S.B. was 14 years old at the time.  (Tr. 222).  S.B. went to Petitioner's house with T.H.  (Tr. 221-23).  After arriving at Petitioner's house, S.B. and T.H. drank alcohol obtained from Petitioner's refrigerator.  (Tr. 223).  Thereafter, S.B., T.H., and E.H. attended parties at Petitioner's house "every weekend."  (Tr. 224).

S.B. testified that "the parties would get out of hand, with people getting undressed" and "everybody" consuming alcohol. (Tr. 224-27, 233-34). Petitioner played a strobe light and used a fog machine at these parties to "enhance" the dancing. (Tr. 251-53). People played strip poker and drinking games. (Tr. 227-29). At one particular party, T.H. and L.K. played strip poker, with T.H. becoming "completely naked" and L.K. becoming "topless." (Tr. 228-30). S.B. testified that Petitioner "normally" played pornographic movies on his television during these parties. (Tr. 231-32). At the time of these parties, T.H. was 15 years old and E.H. was 14 years old. (Tr. 230-31).

At one particular party, Petitioner shaved off S.B.'s pubic hair. (Tr. 236-38). S.B. "sat on the sink in [Petitioner's] bathroom, and [Petitioner] used an electric razor and shaved [the pubic hair] off." (Tr. 236). Petitioner also shaved off, in the same manner, T.H.'s and E.H.'s pubic hair. (Tr. 236-38). S.B. also related an incident in which her sister J.B. was at Petitioner's house. During this particular visit, Petitioner showed S.B. and J.B. a pornographic video. (Tr. 246-49).

S.B. described another incident that occurred between Petitioner, S.B., T.H., and E.H. Petitioner bragged to the three girls that "he could find any girl's G spot, and that he could show [them] where [their G spot] was." (Tr. 239). Petitioner then lined the three girls up against the bathroom wall and inserted his finger into the girls' vagina, purportedly demonstrating to them where their G spot was located. (Tr. 239-41). S.B. testified that she witnessed an incident in which Petitioner inserted a dildo into E.H.'s vagina. (Tr. 241-42). S.B. also described an incident in which a man was using a dildo on T.H., when Petitioner entered the room. (Tr. 242-44). Petitioner told the man, "that's not how you do it, I can do it better, let me show you how to do it," at which point Petitioner began inserting the dildo into T.H.'s vagina. (Tr. 243-44).

5

**L.K.**

L.K. testified that "sometime in January or February" of 1998, she attended a party at Petitioner's house.  (Dkt. #19, Trial Transcript, February 27, 2001, 306-10, 344).  L.K. was 14 years old at the time.  (Tr. 307).  Several people were at this party, including E.H., S.B., K.H., T.H., Joel, Melanie, and Petitioner.  (Tr. 310-12).  During the party, "everybody" consumed alcohol supplied by Petitioner.  (Tr. 311-13, 359-60).

L.K. played strip poker at the party, eventually removing all of her clothing except her underwear.  (Tr. 315-19).  T.H. was also playing strip poker and was eventually completely naked.  (Tr. 318-19).  Petitioner did not play strip poker, but instead "was just kind of watching." (Tr. 317).  After playing strip poker, L.K., still naked except for her underwear, began dancing in Petitioner's living room.  (Tr. 321-27).  Petitioner then began playing pornographic movies on his television.  (Tr. 329-30).  Petitioner later displayed a dildo and dared the girls to insert it into their vagina.  (Tr. 331-34).

**Matthew Schaeding**

Schaeding testified that "somewhere around" January or February 1998, he attended a party at Petitioner's house.  (Dkt. #19, Trial Transcript, February 27, 2001, 306-10, 368-72).  S.B., T.H., and E.H. were at the party, along with numerous other people.  (Dkt. #18, Trial Transcript, February 23, 2001, 122; Dkt. #19, Trial Transcript, February 27, 2001, 306-10, 373, 384).  S.B., T.H., and E.H. were consuming alcohol obtained from Petitioner's refrigerator.  (Dkt. #19, Trial

Transcript, February 27, 2001, 306-10, 375-76).  Schaeding testified that people were playing drinking games and dancing.  (Tr. 376-77).  Petitioner later turned on a strobe light and activated a fog machine.  (Tr. 380).

**Justin Comeford**

Comeford testified that "sometime" during the winter of 1998, he attended a party at Petitioner's house.  (Dkt. #19, Trial Transcript, February 27, 2001, 306-10, 393-96).  Numerous people attended this party, including E.H., T.H., and S.B.  (Dkt. #18, Trial Transcript, February 23, 2001, 121; Dkt. #19, Trial Transcript, February 27, 2001, 306-10, 398).  E.H., T.H., and S.B. were all drinking alcohol.  (Tr. 398-400).  Comeford testified that people at the party were playing drinking games and dancing.  (Tr. 400-02).

**Jeffrey Anthony**

As of May 1999, Anthony was employed as a Detective Sergeant with the Michigan State Police.  (Dkt. #20, Trial Transcript, February 28, 2001, 415-16).  On May 21, 1999, Detective Sergeant Anthony assisted in the execution of a search of Petitioner's residence.  (Tr. 417-19).  During this search, the police recovered pornographic videotapes, a "rubber dildo," and a vibrator.  (Tr. 421-26).

**Eric Schrader**

Schrader testified that he attended a party at Petitioner's residence in January 1998.  (Dkt. #20, Trial Transcript, February 28, 2001, 433-35).  There were "quite a few" people at this

party, including T.H. and E.H. (Tr. 438). There were other girls at the party who were friends with T.H. and E.H., but Schrader did not know their names. (Tr. 442). After everybody, including T.H. and E.H., had been drinking for a couple hours, several of the girls removed all their clothes and began dancing. (Tr. 440-49). Petitioner, who was also completed naked, was dancing and "touching" several of the girls. (Tr. 453-54). While the dancing was taking place, a pornographic movie was played on Petitioner's television. (Tr. 449-50).

**E.H.**

In the fall of 1997, E.H. began attending parties at Petitioner's residence. (Dkt. #20, Trial Transcript, February 28, 2001, 500-02). E.H. was 14 years of age at the time. (Tr. 493). At these parties, E.H. drank alcohol provided to her by Petitioner. (Tr. 502-03, 516-19). Petitioner told E.H. "not to tell anybody" that he was providing them alcohol because "it was supposed to be [their] group secret." (Tr. 517-18).

E.H.'s sister, T.H., also attended these parties. (Tr. 504-07). E.H. and others, including T.H. and Melanie, played drinking games and strip poker at these parties. (Tr. 508-11). During the course of these parties, E.H. and T.H. were was often completely naked. (Tr. 511-16). Pornographic movies were often played on Petitioner's television during these parties. (Tr. 520-21).

E.H. testified that during one of these parties, Petitioner shaved her pubic area. (Dkt. #21, Trial Transcript, March 1, 2001, 538-42). E.H. also witnessed Petitioner shave T.H.'s pubic area. (Tr. 540). E.H. later saw that S.B.'s pubic area had also been shaved, but she did not witness the event. (Tr. 541-42). E.H. also described an incident later that same night in which Petitioner purported to show her where her "G spot" was located. (Tr. 542-44). Petitioner demonstrated this

by inserting a finger into E.H.'s vagina.  (Tr. 542-43).  During a different party, Petitioner penetrated E.H.'s vagina with a dildo.  (Tr. 544-47).  E.H. also recalled another incident in which a "whole bunch of guys" were penetrating T.H. with a dildo.  (Tr. 547-48).  E.H. was unsure if Petitioner participated in this event.  (Tr. 548).

E.H. testified that she attended a "bunch" of parties at Petitioner's house and that afterwards she would sleep at Petitioner's house.  (Tr. 548-49).  A "couple of times" E.H. slept with Petitioner and Melanie.  (Tr. 549).  On one of these occasions, Petitioner and Melanie removed E.H.'s clothes, at which point Petitioner began performing oral sex on E.H. and penetrating her vagina with his finger.  (Tr. 549-50).  Petitioner later began engaging in similar activity with Melanie, after which he returned to E.H. and again penetrated her vagina with his mouth and finger. (Tr. 549-50).

**T.H.**

T.H. first met Petitioner in the fall of 1997.  (Dkt. #21, Trial Transcript, March 1, 2001, 618).  At the time, T.H. was 15 years of age.  (Tr. 617).  Soon thereafter, T.H. began attending parties at Petitioner's house.  (Tr. 618-22).  When she attended these parties, T.H. drank alcohol provided to her by Petitioner.  (Tr. 622-25).  T.H. participated in various drinking games.  (Tr. 626-27).  Petitioner often participated in these drinking games.  (Tr. 627).  T.H. testified that after playing drinking games for several hours, "then clothes would start coming off" and Petitioner would play pornographic movies on his television.  (Tr. 627-33).  Dancing later ensued, at which point Petitioner would turn on a strobe light and fog machine.  (Tr. 634-36).

T.H. described an incident that occurred at one of Petitioner's parties, involving

9

herself, Petitioner, and Melanie.  At one of these parties, T.H. and Melanie were taking a bath together.  (Tr. 639-41).  Petitioner then entered the tub and instructed Melanie and T.H. to begin kissing and touching each other.  (Tr. 642-43).  Petitioner then began touching T.H. and penetrated T.H.'s vagina with his fingers.  (Tr. 643).  Soon thereafter, T.H. exited the tub, at which point Petitioner invited T.H. to "come sleep in [his] bedroom."  (Tr. 643-44).  T.H. agreed and the trio entered Petitioner's bed.  (Tr. 644-45).  Petitioner began having sex with Melanie.  (Tr. 645).  While he was engaged in this activity, Petitioner began penetrating T.H.'s vagina with a dildo.  (Tr. 645-46).  Petitioner then began performing oral sex on T.H., penetrating her vagina with his mouth.  (Tr. 645-47).

T.H. testified about a separate incident in which Petitioner shaved her pubic hair. During one of Petitioner's parties, Petitioner, Melanie, T.H., E.H., and S.B. were watching a pornographic movie when Petitioner instructed T.H. to enter the bathroom, which she did.  (Tr. 648-50).  Petitioner then entered the bathroom and "shaved [T.H.'s] vagina area."  (Tr. 650-52).  E.H. and S.B. also had their pubic areas shaved, but T.H. did not witness that taking place.  (Tr. 652). Later that night, Petitioner offered to show T.H. where her "G spot" was located.  (Tr. 652-53). Petitioner demonstrated this by penetrating T.H.'s vagina with his fingers.  (Tr. 653).


**K.H.**

K.H. testified that she attended a party at Petitioner's house in January 1998.  (Dkt. #21, Trial Transcript, March 1, 2001, 714-15).  K.H. was 13 years of age at the time.  (Tr. 720-21). When K.H. arrived at the party, she observed that "everybody" was drinking.  (Tr. 721-23).  Many people were playing strip poker and drinking games.  (Tr. 721-27).  K.H. observed that T.H. and

10

E.H. had removed their clothes.  (Tr. 726-28).  Petitioner later asked K.H. why she "wasn't getting naked like everybody else."  (Tr. 728-29).  Petitioner "told" K.H. to take her clothes off and "come dance with everybody else."  (Tr. 729-30).  K.H. told Petitioner, "no," but eventually "just kind of gave in" and undressed down to her bra and underwear.  (Tr. 730).  While K.H. was dancing, Petitioner begin playing pornographic movies on his television.  (Tr. 730-31).

Petitioner eventually began dancing with K.H.  (Dkt. #22, Trial Transcript, March 2, 2001, 743-44).  Petitioner, who was wearing only socks and a t-shirt, approached K.H. from behind and placed a hand around her waist.  (Tr. 741-44).  Petitioner then told K.H. that she "was pretty" and "attractive" and that he "liked" her.  (Tr. 744).  Petitioner told K.H. that "he had a girlfriend, but she wouldn't care."  (Tr. 744-45).  When K.H. returned to the kitchen to get dressed, Petitioner followed her and "grabbed at [her] underwear like to pull [her] pants back off."  (Tr, 745-46).  K.H. was eventually able to get her clothes on.  (Tr. 746-47).

Later that night, K.H. overheard Petitioner tell T.H. that he would shave her pubic area for her.  (Tr. 747-48).  Petitioner, Melanie, and T.H. then entered a bathroom.  (Tr. 748-49).  When she exited the bathroom, T.H. "showed" E.H. what Petitioner had done.  (Tr. 749).  E.H. then entered the bathroom with Petitioner.  (Tr. 749).  K.H. witnessed Petitioner shave E.H.'s pubic area.  (Tr. 749-50).

**Gerold Parsons**

As of December 1998, Parsons was employed as a Detective with the Michigan State Police.  (Dkt. #22, Trial Transcript, March 2, 2001, 785-87).  In December 1998, Detective Parsons was assigned to assist in the investigation of this matter.  (Tr. 787).  As part of the investigation,

11

Detective Parsons interviewed many of the witnesses and victims. (Tr. 787-91). Detective Parsons also participated in a search of Petitioner's residence in which the following items were recovered: (1) hair clippers; (2) vibrator; (3) dildo; (4) pornographic movies; (5) strobe light; and (6) fog machine. (Tr. 791-803).

**Laura Holcomb**

Holcomb testified in Petitioner's case-in-chief. Holcomb testified that T.H. and E.H. began to babysit her children in the summer of 1997. (Dkt. #22, Trial Transcript, March 2, 2001, 816-17, 829-31). Holcomb stopped using the girls as babysitters in the fall of 1998 because they were involved in drinking and drugs. (Tr. 818-19, 829-31). Holcomb testified that T.H. and E.H. were always honest with her, but that their reputation for honesty in the community was "not very good at all." (Tr. 820, 827, 853). Holcomb testified that T.H. and E.H. would "come over to [her] house" and ask her to "lie to their parents" about their whereabouts. (Tr. 820).

Holcomb testified that T.H. and E.H. described the parties at Petitioner's house to her. (Tr. 819-20). The girls told Holcomb that the parties involved drinking and people taking their clothes off. (Tr. 820). Holcomb indicated that she was aware that the parties involved the use of a dildo and vibrator. (Tr. 828). Holcomb found Petitioner's parties to be inappropriate. (Tr. 829).

On cross-examination, Holcomb acknowledged that Petitioner admitted to her that T.H. and E.H. attended his parties and that they would get undressed during the course of the parties. (Tr. 837-38). Holcomb also acknowledged on cross-examination that Petitioner related to her an incident in which he watched T.H. use a dildo at one of his parties. (Tr. 840-45). Holcomb described Petitioner as "wanting to still be cool." (Tr. 846).

12

**Melanie Lorentzen**

Melanie testified that she and Petitioner began holding parties at their house in December 1997. (Dkt. #22, Trial Transcript, March 2, 2001, 864-65). Numerous people attended these parties, including T.H., E.H., S.B., K.H., and L.K. (Tr. 865, 868). Melanie acknowledged that "everybody" drank alcohol at these parties, but denied that Petitioner supplied any alcohol to T.H. or E.H. (Tr. 868-69, 871-72). Melanie and Petitioner were both aware that T.H. and E.H. were consuming alcohol, however, Melanie justified it because "we all drank together before." (Tr. 869-70). Melanie acknowledged that T.H., E.H., and L.K. played strip poker and that T.H. and E.H. both "got naked" at these parties. (Tr. 872-75, 885-86, 888). Melanie acknowledged that pornographic movies were shown during these parties, but asserted that it was her and T.H.'s idea. (Tr. 876-78, 886-87).

Melanie also testified regarding the incident in which Petitioner shaved T.H.'s pubic area. Melanie testified that she told T.H. that Petitioner shaved her pubic area, at which point T.H. asked to be shaved as well. (Tr. 882-83). Petitioner, Melanie, and T.H. then entered a bathroom, where Petitioner proceeded to shave T.H.'s pubic area. (Tr. 883-84). Melanie acknowledged that Petitioner possessed a dildo and vibrator and that T.H. used it on herself at one of these parties. (Tr. 888-90). Melanie further acknowledged that Petitioner was aware that this was occurring. (Tr. 890). Melanie asserted, however, that Petitioner neither watched nor participated in this activity. (Tr. 890).

Melanie acknowledged that she and T.H. took a bath together at one of Petitioner's parties. (Tr. 891-94). Melanie denied, however, that Petitioner joined them in the bathtub or that she and T.H. engaged in any sexual activity while in the bathtub. (Tr. 892-94). Melanie asserted that a third person could not have fit into the bathtub. (Tr. 892). On cross-examination, however,

13

Melanie acknowledged that her bathtub was not a normal bathtub, but was instead a "jacuzzi style bathtub." (Tr. 916-17). Melanie further denied that she, T.H., and Petitioner had sex together after taking a bath. (Tr. 892-94). Melanie acknowledged that T.H. slept in a bed with her and Petitioner one night, but denied that any sexual contact or activity occurred. (Tr. 894-95).

**Jason Lorentzen**

Petitioner acknowledged that T.H., E.H., and S.B. attended parties at his house in January 1998. (Dkt. #23, Trial Transcript, March 6, 2001, 940-42). Petitioner acknowledged that these girls were consuming alcohol during these parties. (Tr. 942, 944). Petitioner testified that he allowed this to occur because T.H., E.H., and S.B. were Melanie's friends and he was "trying to get in good" with Melanie. (Tr. 940-42). Petitioner was aware that pornographic movies were being played on his television during his parties. (Tr. 943). Petitioner knew that T.H. and E.H. were taking off all their clothes at these parties. (Tr. 944). Petitioner acknowledged that during these parties he would often take off all his clothing except for a t-shirt. (Tr. 944).

Petitioner acknowledged that he owned a dildo and a vibrator and that "the girls" were using it during these parties. (Tr. 945-46). Petitioner acknowledged that T.H. and E.H. would sleep at his house following these parties. (Tr. 946). Petitioner acknowledged that he shaved off T.H.'s pubic hair during one of his parties. (Tr. 947-49). Petitioner indicated that E.H. also wanted to have her pubic area shaved, but did not "recall" whether he performed that act. (Tr. 949). Petitioner denied that he ever offered to show T.H., E.H., or S.B. where their "G spot" was located. (Tr. 950). Petitioner denied that he ever took a bath with T.H. and Melanie or ever engaged in any sexual contact or activity with any of these girls. (Tr. 950-53).

14

Following the presentation of evidence, the jury found Petitioner guilty of seven counts of third degree criminal sexual conduct, four counts of fourth degree criminal sexual conduct, one count of furnishing alcohol to a minor, and five counts of knowingly disseminating sexually explicit material to a minor.  (Dkt. #25, Trial Transcript, March 8, 2001, 1131-32).  Petitioner received concurrent sentences of 10-15 years for each of the seven counts of third degree criminal sexual conduct.  (Dkt. #26, Sentence Transcript, April 25, 2001, 30).  As for the convictions for fourth degree criminal sexual conduct, Petitioner received concurrent sentences of one year each. (Tr. 29-30).  Petitioner received fines for the other convictions and was also ordered to pay restitution for the therapy in which the victims subsequently participated.  (Tr. 29).  Petitioner appealed his conviction to the Michigan Court of Appeals asserting the following claims:

I.      Defendant was denied his Sixth Amendment right to confrontation when the trial court refused to allow the admission of certain records and testimony about one of the complaining witnesses.

II.     The trial court erred by denying the motion to quash the bindover.

III.    The trial court committed reversible error by allowing testimony that Defendant was a police officer where there was no evidence that Defendant's status as a police officer was used in any way to influence and/or overcome the complaining witnesses.

IV.     The trial court should have used the legislative guidelines to determine the appropriate sentencing range.

The Michigan Court of Appeals affirmed Petitioner's conviction.  *People v. Lorentzen*, No. 234312, Opinion (Mich. Ct. App., Mar. 6, 2003).  Asserting the following claims,

Petitioner moved in the Michigan Supreme Court for leave to appeal:

> I.   The exclusion of a witness' diary, school records, and auto accident report was an abuse of the trial court's discretion where the evidence was not precluded by the rape-shield statute or the rules of evidence and violated the Defendant's Sixth Amendment right to confrontation.

> II.  The denial of the Defendant's motion to quash and/or remand the case for a new preliminary examination was an abuse of the trial court's discretion as the withholding of material, exculpatory evidence by the prosecution constituted a *Brady* violation that violated the Defendant's due process right to a fair proceeding.

> II.  The trial court abused its discretion by admitting evidence of the Defendant's prior background as a police officer where this information was irrelevant and highly prejudicial.

> IV.  The trial court erred by failing to use the statutory sentencing guidelines to determine the appropriate sentencing range.

The court denied Petitioner's request for leave to appeal, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Lorentzen*, No. 123485, Order (Mich., Aug. 29, 2003). On November 18, 2004, Petitioner filed in the trial court a motion for relief from judgment in which he asserted the following claims:

> I.   The "struck jury" method, whereby the entire pool of prospective jurors are seated numerically, and challenges exercised until exhausted, leaving the lowest-numbered 14 jurors as the selected jury, is not permissible. Here, the trial court seated all 27 prospective jurors in numerical order, counsel exercised challenges, and the 14 lowest-numbered jurors of those remaining were seated as the jury. This method violated Michigan precedent and court rule. This was error entitling Defendant to relief from

judgment.

II.    Defendant was entitled to due process of law and a fair trial. These constitutional rights were violated by the prosecutor's repeated and intentional injection of irrelevant, prejudicial evidence into the trial, by reminding the jury at every opportunity that Defendant was a police officer by vocation. The trial court erred by admitting the evidence, and the prosecutor's extensive use of it constituted misconduct. This was error entitling Defendant to relief from judgment.

III.    Defendant was entitled to the effective assistance of trial counsel. However, his trial attorneys failed to object to the improper jury selection method, and erroneously advised Defendant to testify and admit guilt to several of the charged offenses. These and other errors denied Defendant the effective assistance of trial counsel. This was error entitling Defendant to relief from judgment.

IV.    Defendant was entitled to the effective assistance of appellate counsel. However, his appellate attorney was operating under a conflict of interest, having also served as trial counsel. Therefore, valid claims of improper jury selection method and ineffective assistance of trial counsel were not raised on appeal. These and other errors denied Defendant the effective assistance of appellate counsel. This was error entitling Defendant to relief from judgment.

Petitioner's motion was denied. *People v. Lorentzen*, No. 99-018099-FH, Opinion (Saginaw Cnty. Cir. Ct., April 28, 2005). Asserting the same claims, Petitioner appealed the matter to the Michigan Court of Appeals, which denied his request "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Lorentzen*, No. 262863, Order (Mich. Ct. App., Dec. 6, 2005). Asserting the same claims, Petitioner moved in the Michigan Supreme Court for leave to appeal. The court denied Petitioner's request because he "failed to meet

the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Lorentzen*, No.

130411, Order (Mich., May 30, 2006).  On June 2, 2006, Petitioner initiated the present action,

asserting the following claims:

> I.  Petitioner's constitutional rights to due process and a fair trial were denied when the trial court employed a method of jury selection that interfered with Petitioner's fundamental right to trial by an impartial jury.
>
> II.  Petitioner's constitutional rights to due process and a fair trial were denied by the prosecutor's repeated and intentional injection of irrelevant, prejudicial evidence into the trial.
>
> III.  Petitioner was denied his constitutional right to the effective assistance of trial counsel.
>
> IV.  Petitioner was denied his constitutional right to the effective assistance of appellate counsel.

## **STANDARD OF REVIEW**

Lorentzen's petition is subject to the provisions of the Antiterrorism and Effective

Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.  The AEDPA amended the

substantive standards for granting habeas relief under the following provisions:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists."  *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999).  The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court.  *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Williams,* 529 U.S. at

19

411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

As noted above, the Michigan courts did not address any of the claims asserted by Johnson in his petition for writ of habeas corpus. The deferential standard articulated by the AEDPA does not apply if the state has failed altogether to review a particular claim. As the Sixth Circuit has indicated, where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." In such circumstances, the court

conducts a *de novo* review.  *See McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003); *see also Wiggins v. Smith*, 123 S. Ct. 2527, 2542 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

Petitioner failed to assert on direct review in the state courts any of the claims asserted in his petition for writ of habeas corpus, instead asserting them for the first time in his post-conviction motion for relief from judgment.  As previously noted, because Petitioner failed to assert these claims on direct appeal, the Michigan Court of Appeals and the Michigan Supreme Court refused to address the merits thereof.  Accordingly, Petitioner has procedurally defaulted the claims asserted in the present petition.

Under the procedural default doctrine, federal habeas review is barred where a state court declined to address Petitioner's claims because of a failure to satisfy state procedural requirements.  *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).  Where Petitioner's claims have been procedurally defaulted, the state court judgment rests on an independent and adequate state ground precluding review by a federal court.  *See Coleman*, 501 U.S. at 750-51; *Wainwright v. Sykes*, 433 U.S. 72, 81 (1977); *Harris v. Reed*, 489 U.S. 255, 262 (1989).

The Sixth Circuit employs a multi-part test to determine if a petitioner has procedurally defaulted a particular issue: (1) there must exist a state procedural rule that is applicable to the claim and with which the petitioner failed to comply, (2) the state court must have actually

enforced the state procedural rule, and (3) the default must constitute an "independent and adequate" state ground on which the state can rely to foreclose review of a federal constitutional claim. *See Williams v. Bagley*, 380 F.3d 932, 966 (6th Cir. 2004).

It must be remembered, however, that for the procedural default doctrine to apply, "the last state court rendering a judgment in the case must have based its judgment on the procedural default." *Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000).  Furthermore, review by a state court of a procedurally defaulted claim to prevent manifest injustice does not constitute a review on the merits sufficient to excuse procedural default. *See Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006) ("a state court's plain error analysis does not save a petitioner from procedural default").

If Petitioner has procedurally defaulted a particular claim, federal habeas review is available only if he can establish either (1) the existence of cause for his default and actual prejudice resulting therefrom, or (2) that the failure to consider the merits of the claim will result in a fundamental miscarriage of justice. *See Bagley*, 380 F.3d at 966 (citing *Coleman*, 501 U.S. at 750).

With respect to cause, Petitioner must demonstrate the existence of some objective factor, external to the defense, which impeded his efforts to comply with the applicable procedural rule. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Johnson v. Wilson*, 187 Fed. Appx. 455, 458 (6th Cir., June 16, 2006).  To establish that a miscarriage of justice would result from the failure to review his procedurally defaulted claims, Petitioner must make a "colorable showing of factual innocence." *McCleskey v. Zant*, 499 U.S. 467, 495 (1991).  To satisfy this requirement Petitioner must demonstrate the existence of new and reliable evidence, not presented at trial, which establishes that some constitutional error "probably resulted" in the conviction of an innocent person. *See Schlup v. Delo*, 513 U.S. 298, 324-27 (1995).  The evidence must show that it is "more likely than

22

not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 326-27.

Michigan Court Rule 6.508 provides that a defendant may not collaterally attack a conviction based upon claims that were decided against him in a prior appeal or that could have been raised in a prior appeal. M.C.R. 6.508(D)(2)-(3). With respect to claims which could have been raised in a prior appeal, a defendant is entitled to relief only if he can establish both "good cause" for failing to assert the issue previously and "actual prejudice" resulting therefrom. M.C.R. 6.508(D)(3). In this context, "actual prejudice" is defined as a "reasonably likely chance of acquittal" or an "irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand." M.C.R. 6.508(D)(3)(a)-(b).

The Sixth Circuit has held that denial of leave to appeal on the basis that a petitioner "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)," constitutes a sufficient determination that the court's conclusion was based on procedural default. *See Burroughs v. Makowski*, 282 F.3d 410, 414 (6th Cir. 2002). Furthermore, Rule 6.508(D), regularly followed since 1990, constitutes an independent and adequate state ground, the reliance on which precludes federal review of those issues against which it is applied. *Simpson*, 238 F.3d at 407.

Petitioner has failed to demonstrate cause and prejudice to overcome his procedural default. He has likewise failed to demonstrate that failure to address the merits of his claims will result in a fundamental miscarriage of justice. Even could Petitioner make such a showing, however, the result would be the same, as Petitioner's claims are without merit as discussed below.

23

A.    Jury Selection

Petitioner challenges the method by which his jury was selected. Petitioner acknowledges that this claim is premised upon a violation of state law, but asserts that the alleged violation of state law at issue violated his Sixth Amendment right to "trial by an impartial jury." The Court disagrees, as the method by which the jury was selected in this matter violates neither Michigan nor federal law.

In *People v. Miller*, 307 N.W.2d 335 (Mich. 1981), the Michigan Supreme Court reversed the criminal convictions obtained against Miller and another individual due to the method of jury selection employed by the trial court. The trial court utilized the "struck jury method," a method by which a large number of jurors are seated, and following any challenges for cause, the parties exercise peremptory challenges until the necessary number of jurors remain. *Id.* at 336; *see also*, *Swain v. Alabama*, 380 U.S. 202, 210 (1965). If the parties exhaust (or no longer wish to exercise) their peremptory challenges before the pool is reduced to the necessary number, the court simply selects the jurors with the lowest numbers until the necessary number of jurors is obtained. *Miller*, 307 N.W.2d at 336; *Swain*, 380 U.S. at 210.

The Michigan Court of Appeals acknowledged that the method by which the jury was selected violated then current Michigan Court Rules, but nevertheless affirmed the defendants' convictions on the ground that they suffered no prejudice as a result of the faulty jury selection method. *Id.* at 336-37. The Michigan Supreme Court agreed that the defendants had not suffered prejudice as a result of the improper jury selection method, but concluded that "given the fundamental nature of the right to trial by an impartial jury, and the inherent difficulty of evaluating such claims, a requirement that a defendant demonstrate prejudice would impose an often impossible

burden." *Id.* at 337.  The court, therefore, reversed the defendants' convictions and ordered that they be afforded new trials.  *Id.*

    Petitioner asserts that the jury in his criminal trial was selected by the struck jury method rejected by the Michigan Supreme Court in *Miller*.  Petitioner raised this issue to the trial court in his post-conviction motion for relief from judgment.  The court rejected Petitioner's claim, noting that the process by which Petitioner's jury was selected was distinguishable from the struck jury method.  *People v. Lorentzen*, No. 99-018099-FH, Opinion at 1-2 (Saginaw Cnty. Cir. Ct., April 28, 2005) (citing *People v. Hinchey*, 2003 WL 231320 (Mich. Ct. App., Jan. 21, 2003)).

    In *Hinchey*, the Michigan Court of Appeals rejected a challenge to the method of jury selection employed at Hinchey's criminal trial.  The court described the jury selection method employed at Hinchey's trial as follows:

> The court randomly seated a panel of twenty-eight jurors from the pool.  After voir dire, six jurors were removed for cause.  After each juror was removed, the juror with the next highest seat number to 14 took the person's seat.  For example, when the juror in seat 3 was removed, the juror in seat 15 took his place.  Next, each party alternated exercising three peremptory challenges.  After each juror was removed, he was replaced with the person sitting in the next highest seat number to 14.  Replacement jurors were questioned further as needed to determine if additional challenges for cause existed.  The parties then expressed satisfaction with the jury.

*Id.* at *1.

    The court concluded that the jury selection method employed at Hinchey's trial "was not the 'struck jury method,' as each juror was replaced when removed."  *Id.* at *2.  The court also recognized, however, that the method by which replacement jurors was selected was not entirely random.  In this respect, the court observed that "[a]lthough the element of randomness was removed

25

from the juror replacement process, it was not removed from the jury selection process as a whole." The court concluded, therefore, that the jury selection method employed at Hinchey's trial "did not deny [Hinchey] a fair trial." *Id.* The jury selection method employed at Petitioner's trial was the same method approved of by the *Hinchey* court. (Dkt. #15, 17).

Thus, Petitioner has failed to demonstrate that his jury was selected in a manner contrary to Michigan law. Petitioner likewise fails to demonstrate that the manner in which his jury was selected violates his federal constitutional rights. Petitioner asserts that the manner in which his jury was selected "removed the element of randomness that is a fundamental part of the constitutional right to an impartial jury."

The Sixth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment thereto, guarantees to every criminal defendant the right to a "fair trial" by a panel of "impartial and indifferent" jurors. *Morgan v. Illinois*, 504 U.S. 719, 726-27 (1992). Criminal defendants also enjoy the right to be tried by a jury drawn from a fair cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 529-30 (1975)). While the jury must be *selected from* a pool which represents a fair cross-section of the community, the jury as actually selected need not be so diverse. *See Batson v. Kentucky*, 476 U.S. 79, 85 n.6 (1986). Petitioner asserts no violation of these constitutional rights. While the Supreme Court has identified these (and other) constitutional protections afforded to criminal defendants regarding the jury selection process, the Court has never held that criminal defendants enjoy the constitutional right to a randomly selected jury, in the sense asserted by Petitioner. *See United States v. Nelson*, 718 F.2d 315, 319 (9th Cir. 1983) (there exists "no constitutional right to a randomly selected jury"); *United States v. Hawkins*, 566 F.2d 1006, 1012 (5th Cir. 1978) (same); *United States v. Scrushy*, 2007 WL 1296000

26

at *10 (M.D. Ala., May 1, 2007) (same).

The Court recognizes that "[i]t is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community." 28 U.S.C. § 1861. This provision, even if interpreted in a manner inconsistent with the jury selection method employed at Petitioner's trial, affords Petitioner no relief. This provision, rather than articulating a constitutional requirement, merely reflects "the policy of the United States" on this particular subject. *See, e.g.,* United States v. Guzman, 337 F.Supp. 140, 142 (S.D.N.Y. 1972) ("the standards embodied in [28 U.S.C. § 1861] embrace and go beyond the constitutional requirements").

In sum, Petitioner has failed to demonstrate that the manner in which his jury was selected violated Michigan law or clearly established Supreme Court authority. Thus, this claim cannot form the basis for habeas relief.

B.    Prosecutorial Misconduct

Petitioner asserts that the prosecutor engaged in misconduct by eliciting testimony at trial that he was a police officer. As the Sixth Circuit has stated, "[w]hen a petitioner makes a claim of prosecutorial misconduct, 'the touchstone of due process analysis...is the fairness of the trial, not the culpability of the prosecutor.'" *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).

The issue is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). Thus, even if the

27

challenged comments were improper, habeas relief is available only where the comments "were so flagrant as to render the entire trial fundamentally unfair." *Gillard*, 445 F.3d at 897.  When assessing whether an improper comment resulted in a denial of the right to a fair trial, the Court must consider the following factors: (1) the likelihood that the comments mislead the jury or prejudiced the accused; (2) whether the comments were extensive or isolated; (3) whether the remarks were deliberately or accidentally presented to the jury; and (4) whether the evidence against the accused was substantial.  *Id.*

While Petitioner did not assert a claim of prosecutorial misconduct on direct appeal, he did argue in his direct appeal that evidence regarding Petitioner's status as a police officer should not have been admitted.  The Michigan Court of Appeals rejected this claim, concluding:

> Defendant's status [as a police officer] was probative to the extent that at least one of the witnesses testified that he felt more comfortable consuming alcohol at defendant's house because of that status.  Therefore, we believe that the evidence was relevant.  Moreover, we are not prepared to say that defendant's status as a police officer was prejudicial; indeed, it is possible that some of the jurors were less inclined to believe that defendant engaged in this activity because he was a police officer.  Accordingly, the trial court did not abuse its discretion in allowing the evidence.

*People v. Lorentzen*, No. 234312, Opinion at 2 (Mich. Ct. App., Mar. 6, 2003) (internal citations omitted).

Petitioner has identified the several instances in which the prosecutor referred to Petitioner's status as a police officer.  (Dkt. #2 at 18-22).  The Court fails to discern anything inappropriate about this testimony as Petitioner's status as a police officer was relevant, as stated by the Michigan Court of Appeals.  However, even if the Court were to find that the references to Petitioner's status as a police officer were inappropriate such would not entitle Petitioner to relief.

28

The references to Petitioner's status as a police officer were isolated and were by no means an integral or significant component of the prosecutor's case. The Court is not persuaded that the prosecutor's conduct mislead the jury or prejudiced Petitioner. Finally, the evidence against Petitioner was simply overwhelming. In sum, the prosecutor's comments, even if inappropriate, did not deny Petitioner of a fair trial. Accordingly, this claim is without merit.

C.     Ineffective Assistance of Trial Counsel

Petitioner asserts that he is entitled to habeas relief because his constitutional right to the effective assistance of counsel was violated. Petitioner asserts that his trial counsel was ineffective for (1) failing to object to the method by which the jury was selected, (2) permitting Petitioner and Melanie Lorentzen to testify, (3) failing to object to an improper exhibit, (4) failing to request a mistrial, and (5) eliciting damaging evidence on cross-examination of T.H.

To establish that he was denied the right to the effective assistance of counsel, Petitioner must establish that his counsel's performance was so deficient that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Accordingly, Petitioner must demonstrate that his attorney's actions were unreasonable under prevailing professional norms. *Id.* at 688. In assessing such a claim, however, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance. Prejudice, in this context, has been defined as "a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008). This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

### 1.      Failing to Object to the Method by which the Jury was Selected

As discussed above, the manner in which the jury was selected violated neither Michigan nor federal law. Counsel's failure to object thereto cannot have constituted ineffective assistance, therefore, as Petitioner was not prejudiced thereby.

### 2.      Permitting Petitioner and Melanie Lorentzen to Testify

As for counsel's decision to permit Petitioner and Melanie Lorentzen to testify, the Court finds that such was a legitimate and reasonable strategic decision. Moreover, even if counsel's decision in this regard did constitute deficient performance, Petitioner cannot demonstrate that he suffered prejudice as a result.

The evidence presented by the State in its case-in-chief overwhelmingly supported a guilty verdict. Considering the overwhelming evidence of guilt presented by the prosecution, it was not unreasonable for counsel to conclude that Petitioner stood little if any chance of acquittal as to any charge, unless the jury could be persuaded that Petitioner was the more credible witness. It was not unreasonable, therefore, for counsel to conclude at that juncture that unless Petitioner and his wife took the stand, Petitioner would be convicted on every charge.

In light of these circumstances, the strategy employed by Petitioner's trial attorney seems very clear.  Counsel allowed Petitioner and his wife to acknowledge Petitioner's liability as to some of the less serious charges in an attempt to persuade the jury that Petitioner was the more credible witness.  It was not unreasonable for counsel to conclude that this strategy, if successful, would result in an acquittal as to the most serious charges Petitioner faced.  In retrospect, this strategy was largely unsuccessful, although the Court notes that Petitioner was acquitted of two of the nine charges of third degree criminal sexual conduct.

This lack of success notwithstanding, Petitioner has failed to overcome the presumption that, under the circumstances, counsel's actions constituted "sound trial strategy." While counsel's strategy was not without risk, in light of the overwhelming evidence of guilt presented by the prosecution, the Court is hard pressed to determine what better strategy counsel could have followed.  Thus, the Court finds that counsel's performance was constitutionally adequate.  Moreover, even if counsel's performance was deficient, Petitioner simply cannot establish that he was prejudiced thereby, as the evidence of his guilt was simply overwhelming.

3.      Failure to Object

As noted above, Detective Sergeant Anthony testified that he assisted in the execution of a search of Petitioner's residence.  (Dkt. #20, Trial Transcript, February 28, 2001, 417-19). During Anthony's testimony, he was shown a photograph of Petitioner's bedroom.  (Tr. 424). Anthony testified that the photograph fairly and accurately depicted the bedroom as it existed when he assisted in the search of Petitioner's residence.  (Tr. 424-25).

Petitioner faults his attorney for failing to object to the admission of this photograph.

31

Petitioner asserts that the photograph was inadmissible because the photograph revealed that Petitioner kept "a couple of sets of handcuffs" on his bed. There is no evidence that this was a photograph of handcuffs designed to prejudice the jury, as Petitioner suggests. Instead, it appears that this was simply a photograph of the headboard of Petitioner's bed as it existed at the time of the search. The description of the photograph reveals that the handcuffs were simply one of the many items located on or in the headboard. The Court fails to discern any legitimate objection to the introduction of this photograph. Thus, Petitioner cannot establish that he was prejudiced by his attorney's failure to object to the introduction of this photograph.

4.      Failure to Request a Mistrial

Petitioner faults his attorney for failing to request a mistrial following testimony from a victim concerning conduct for which Petitioner was not criminally charged.

When T.H. testified, she related an incident in which Petitioner penetrated her vagina with a dildo and then performed oral sex on her. (Dkt. #21, Trial Transcript, March 1, 2001, 645-46). Petitioner, outside the presence of the jury, objected to the testimony concerning Petitioner performing oral sex on T.H. because Petitioner had not been charged for such. (Tr. 662-67). The trial judge observed that the testimony in question may have been improper and offered to provide the jury with a curative instruction. (Tr. 666). Petitioner faults his attorney for failing to move for a mistrial. Petitioner has presented no authority indicating that such an extreme remedy was appropriate in response to such an isolated occurrence. Thus, Petitioner has failed to demonstrate that he was prejudiced by his attorney's alleged shortcoming.

5.    Cross-Examination of T.H.

On direct examination, T.H. testified that Petitioner penetrated her vagina with his finger. (Dkt. #21, Trial Transcript, March 1, 2001, 653). T.H. further testified, however, that she could not recall whether she witnessed Petitioner similarly penetrate E.H. or S.B. (Tr. 653-54). On cross-examination, Petitioner's attorney impeached T.H. with prior testimony in which she stated that she had witnessed Petitioner digitally penetrate E.H. and S.B. (Tr. 694-97). After she was confronted with her contradictory statements, T.H. stated that she had, in fact, witnessed Petitioner penetrate E.H. and S.B. (Tr. 697).

Petitioner asserts that his attorney was ineffective for pursuing this tactic. The Court disagrees. Given that Petitioner's trial was almost exclusively a credibility contest, it was absolutely necessary that counsel do everything he could to attempt to persuade the jury that the victims were not worthy of belief. The exchange in question attempted to demonstrate such. The Court finds that it did not constitute deficient performance to pursue this line of questioning. Moreover, even if counsel's performance was deficient in this regard, in light of the overwhelming evidence of guilt in this matter, including other evidence that Petitioner penetrated E.H. and S.B., Petitioner cannot establish that he suffered prejudice as a result.

D.    Ineffective Assistance of Appellate Counsel

Petitioner asserts that his appellate counsel rendered ineffective assistance by failing to assert on direct appeal the following claims: (1) that the jury selection method was improper, and

(2) ineffective assistance of trial counsel.  As discussed above, neither of these claims has merit. Thus, counsel's failure to assert them on appeal did not prejudice Petitioner.  Accordingly, this claim is without merit.

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States.  Accordingly, the undersigned recommends that Lorentzen's petition for writ of habeas corpus be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  May 20, 2009                        /s/ Ellen S. Carmody
                                   ELLEN S. CARMODY
                                   United States Magistrate Judge


34